# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

ANGEL SOTO,                          :        CIVIL NO. 1:CV-10-02366
                                     :
      **Plaintiff**          :        (Judge Rambo)
                                     :
  v.                              :
                                     :
THOMAS LESKOWSKY, *et al.*,          :
                                     :
      **Defendants**        :

## M E M O R A N D U M

On November 16, 2010, Plaintiff Angel Soto ("Soto"), an inmate currently

confined at the State Correctional Institution in Dallas, Pennsylvania ("SCI-Dallas"),

filed a civil rights complaint pursuant to the provisions in 42 U.S.C. § 1983. (Doc. 1-

1.) Named as Defendants are a number of prison officials and medical personnel at

SCI-Dallas.[1] In his complaint, Soto alleges that on March 18, 2008, while working in

the mattress factory at SCI-Dallas, he sustained an injury to his right bicep muscle.

He further avers that after initially receiving treatment at the infirmary, the subsequent

treatment he received was unnecessarily delayed. This delay, Soto claims, caused his

---

[1] Named as Defendants are Thomas Leskowsky, former Director of Corrections Health Care Services; Patricia Ginocchetti, former Corrections Health Care Administrator; Kim Harris, Nurse; Renee Waligun, Nurse; Bureau of Health Care Services; Richard Ellers, Director, Bureau of Health Care Services (hereinafter "DOC Defendants"); and Stanley Bohinski, M.D., Medical Director; and Don O'Brien, Physician Assistant (hereinafter "Medical Defendants"). After considering a motion to dismiss filed in this case, the court dismissed as parties two previously-named Defendants, Jerome Walsh, Deputy Superintendent for Centralized Services, and Michael Klopotoski, former Superintendent, by order dated September 27, 2011. (Doc. 33.)

bicep injury to become inoperable and caused him to lose some functionality in his arm. Soto also alleges the delay in treatment was the result of a policy or custom within the Department of Corrections ("DOC") to avoid surgical intervention for budgetary reasons.

Before the court are two motions for summary judgment, filed by DOC Defendants and Medical Defendants. (Docs. 56 & 60.) Also before the court is a motion to compel discovery, filed by Soto after the motions for summary judgment were filed by both sets of Defendants. (Doc. 66.) For the reasons set forth below, the motions for summary judgment will be granted. Further, as a result of this disposition, the motion to compel discovery will be deemed moot.

I.      **Background**

A.      **Facts**

In support of their motions for summary judgment, both sets of Defendants have submitted statements of material facts. (Docs. 58 & 63.) Because Soto has failed to file an opposing statement of material facts, the following facts submitted by both sets of Defendants are deemed admitted. *See* M.D. Pa. L.R. 56.1.

In his complaint, Soto alleges that on March 18, 2008, sometime between 2:00 p.m. and 3:00 p.m., while working at SCI-Dallas' mattress factory, he felt something

"'pop' in his arm and felt a burning sensation in his bicep muscle." (Doc. 1-1 at 3; Doc. 58 ¶ 9.) Soto reported his injury to the foreman and was permitted to seek treatment at the infirmary immediately. (Doc. 58 ¶ 10.) Once he reached the medical department, he was seen by Physician's Assistant ("PA") O'Brien for right arm pain.[2] (Doc. 63 ¶ 14.) Soto reported to PA O'Brien that, "It's been hurting for a while, but a little while ago while carrying stuff at work I felt a tearing sensation and a lot of pain." (*Id.* ¶ 15.) Upon physical examination, PA O'Brien noted that there was a visible defect (a small area of disruption of symmetry) in Soto's right biceps proximally (toward the shoulder) and medially (toward the center line), with associated tenderness and minimal swelling. (*Id.* ¶ 16.) He was able to move his right arm through the full range of motion at his elbow. (*Id.* ¶ 17.) Additionally, there was no spasm and no nerve or blood vessel injury detected. (*Id.* ¶ 18.) PA O'Brien ordered anti-inflammatory/pain relief medication, and that Soto be "laid in" for twenty-four (24) hours, meaning that he was not to perform physical labor, participate in yard, or go to the gym, in order to avoid further aggravation of an existing or likely injury. (*Id.* ¶ 19.) PA O'Brien also directed Soto to return the next day for follow-up at mandatory sick call. (*Id.* ¶ 20.) According to PA O'Brien, he appreciated that biceps tendon injuries such as Soto's typically respond well to conservative treatment, with

---

[2] In his deposition taken for this case, Soto stated that he was seen by "a couple nurses and I think there was a physician . . . ." (Doc. 58 ¶ 11.)

some negligible loss of strength associated with such injuries regardless of treatment, and it was his medical professional judgment that consultation with other specialized providers was not medically necessary or critical at that time. (*Id.* ¶ 22.)

On March 19, 2008, Soto reported to the medical department at sick call, and was seen by a PA Bunk.[3] (*Id.* ¶ 24.) Soto complained to PA Bunk that his right biceps were tender with a burning sensation, but he was still able to move his arm. (*Id.* ¶ 25; Doc. 63-3 at 7.) Upon examination, PA Bunk noted that Soto had a visible defect in his right biceps, and had tenderness with palpation. (Doc. 63 ¶ 26; Doc. 63-3 at 7.) He had full range of motion, no ecchymosis (a hemorrhagic area), and no open wound. (*Id.* ¶ 27.) PA Bunk ordered continuation of anti-inflammatory/pain relief medication, continued "lay in," and an x-ray of Soto's right upper extremity, with attention specifically directed to findings potentially related to soft tissue/muscle injury. (*Id.* ¶ 32.) She also noted that a physical therapy evaluation may be needed. (Doc. 63-3 at 7.) PA Bunk also consulted with Dr. Bohinski and/or Stanley Stanish, M.D., the Regional Medical Director,[4] on that day. (Doc. 63 ¶ 24.) Dr. Bohinski signed off on PA Bunk's March 19, 2008 progress note, after reviewing PA O'Brien's order from the previous day, March 18, 2008. (*Id.* ¶¶ 28, 29.) After the consultation

---

[3] PA Bunk is not a named Defendant in this action.

[4] Dr. Stanish is not a named Defendant in this action.

between PA Bunk, Dr. Stanish, and Dr. Bohinski, it was decided that Soto's injury would be evaluated six (6) days later, on March 25, 2008, at which time the possibility of consulting with other specialized provider(s) would be considered. (*Id*. ¶ 31.) Further, a conservative course of treatment was continued. (*Id*. ¶ 33.) Specifically, Dr. Bohinski, like PA O'Brien, appreciated that biceps tendon injuries such as Soto's typically respond well to conservative treatment, with some negligible loss of strength associated with such injuries regardless of treatment, and it was the collective medical professional judgment that consultation with other specialized providers was not medically necessary or critical at that time. (*Id*. ¶ 34.)

On March 20, 2008, an x-ray of Soto's right upper extremity was performed. (*Id*. ¶ 37.) The x-ray was interpreted by a radiologist on March 24, 2008 to reveal the following: "Radiographs of the right humerus demonstrates [sic] unremarkable soft tissues with no fracture or deformities. The visualized bones are well intact and the joint spaces are well preserved." (*Id*. ¶¶ 38, 39.)

On March 25, 2008, Soto presented at mandatory sick call for follow-up, as was previously directed, and was seen by PA Bunk. (*Id*. ¶ 40.) Soto reported continuing pain and the presence of a "lump" in his right arm, but was in no apparent distress. (*Id*. ¶ 41.) Upon examination, PA Bunk noted some edema (swelling) over the right biceps muscle and tenderness with palpation. (*Id*. ¶ 42.) Further, Soto had slightly

5

decreased strength in his right arm, but full range of motion in most directions. (*Id*. ¶ 43.) Dr. Stanish signed off on PA Bunk's March 25, 2008 progress note. (*Id*. ¶ 44.)

On that same day, PA Bunk consulted with Dr. Stanish and/or Dr. Bohinski regarding her assessment of Soto, and the status of his right biceps injury. (*Id*. ¶ 45.) It was decided that a physical therapy consultation was needed. (*Id*. ¶ 46.) Soto was called in to the dispensary and advised of the plan, and a physical therapy consult was written at that time. (*Id*. ¶ 47.) Further, PA Bunk ordered continued "lay in" and continuation of anti-inflammatory/pain relief medication. (*Id*. ¶ 48.)

On April 7, 2008, Soto underwent a physical therapy consultation. (*Id*. ¶ 49.) The physical therapist noted a deformity of the right biceps and recorded the flexibility in the elbow and shoulder. (Doc. 63-2 at 17.) He stated that Soto would benefit from self-performance of exercises, including range of motion and lightweight curls. (Doc. 63 ¶ 51; Doc. 63-2 at 17.) He also stated that Soto would be a good surgical candidate if he met the appropriate criteria for such surgery. (Doc. 63 ¶ 52; Doc. 63-2 at 17.) There is nothing in the record indicating what would be the appropriate criteria.

On April 9, 2008, Dr. Bohinski ordered Soto to return to mandatory sick call to discuss his physical therapy consultation. (Doc. 63 ¶ 53.) Soto presented to mandatory sick call on April 10, 2008, and was seen by PA O'Brien. (*Id*. ¶ 54.) PA

6

O'Brien reviewed Soto's medical record, learning of the physical therapist's prescribed course of treatment, and recalls questioning whether Soto's right biceps injury was aggravated. (*Id.* ¶ 55.) Based on the updated information, PA O'Brien ordered ongoing rest in the form of activity, housing and employment restrictions, and a consultation with an orthopedic surgeon, based on the recent question by the physical therapist as to whether Soto's injury made him a candidate for surgical treatment. (*Id.* ¶ 56.)

On April 16, 2008, Dr. Bohinski saw Soto for a condition unrelated to his right biceps injury. (*Id.* ¶ 57.) At that time, Soto made no complaints to him regarding his right biceps injury. (*Id.*)

Soto was taken to see outside orthopedic surgeons Michael C. Raklewicz, M.D., and James M. Mattucci, Jr., M.D., of Orthopedic Consultants of Wyoming Valley ("OCWV") on May 8 and 9, 2008, respectively. (*Id.* ¶ 58.) These appointments were the first available dates on which Soto could be taken for an off-site medical appointment, taking into account the calendars of SCI-Dallas, OCWV, and the applicable security restrictions. (*Id.* ¶ 59.) In his deposition taken in connection with this action, Soto conceded that Defendants Waligun and Harris, both Registered Nurses at SCI-Dallas, did not have the authority to order his transport to an outside physician for consultation. (Doc. 58 ¶ 23; Doc. 63-1 at 10, Soto Dep.)

On May 8, 2008, Soto presented to Dr. Raklewicz as a 49-year old male who previously had injured his right shoulder while lifting a mattress, and was complaining of continued pain and weakness.[5]  (Doc. 63 ¶¶ 60, 61.)  Upon examination, Soto was found to have a proximal (toward the shoulder) biceps tendon rupture in his right arm.  (*Id.* ¶ 62.)  In Dr. Raklewicz's professional opinion as a general orthopedic surgeon, no surgical repair of the injury was medically necessary, regardless of when Soto presented to him in temporal relation to the occurrence of the injury.  (*Id.* ¶ 63.)  Dr. Racklewicz based his opinion on Soto's age and physical status, the nature of the injury, and the risks of surgical intervention outweighing potential benefits.  (*Id.* ¶ 64.)  He concluded that surgical intervention at any time would have been elective and chiefly for cosmetic purposes.[6]  (*Id.* ¶ 65.)  In his declaration, Dr. Raklewicz asserts that, based on the considerations particular to Soto, he would not have performed surgery even if requested to do so on an elective basis.  (*Id.* ¶ 66.)  He also states that in his entire career to date, he cannot recall a patient in a situation similar to Soto undergoing a surgical repair.  (*Id.* ¶ 67.)  Rather, patients similarly situated to Soto

---

[5]  In his declaration, Dr. Raklewicz indicates that the injury occurred on or about April 8, 2008.  (*See* Doc. 63 ¶ 60.)

[6]  In an appendix filed in support of his opposition to the motions for summary judgment, Soto submitted information on ruptured biceps tendon injuries from "Medical Disability Guidelines," available at http://mdguidelines.com/ruptured-biceps-tendon-traumatic-and-nontraumatic.  (Doc. 78, Ex. A.)  In this information, it is explained that "[p]artial ruptures may be treated conservatively or surgically."  (Doc. 78 at 7.)

8

recover well without surgical intervention. (*Id.* ¶ 69.) Further, he concluded that there was no risk of serious harm to Soto based on the fact that he was brought in for an orthopedic evaluation on May 8, 2008, for an injury sustained on March 18, 2008. (*Id.* ¶ 68.)

Despite his conclusions, Dr. Raklewicz referred Soto to his partner, Dr. Mattucci, who is fellowship-trained in sports medicine, for a more specialized evaluation of Soto's right biceps injury, and "to see if he wants to repair this." (*Id.* ¶ 63; Doc. 63 ¶ 58 n.3; Doc. 63-4 at 5.)

On May 9, 2008, Dr. Mattucci evaluated Soto based on a possible recommendation for surgical repair.[7] (Doc. 63 ¶ 71; Doc. 63-2 at 22.) Upon examination, Dr. Mattucci concluded that "[n]o surgery [was] needed (cosmetic only)." (Doc. 63 ¶ 71; Doc. 63-2 at 22.) In his complaint, Soto avers that Dr. Mattucci told him that he would lose anywhere from 5-10% of his overall strength of his right arm. (Doc. 1-1 ¶ 19.)

---

[7] Attached to their statement of material facts, Medical Defendants have submitted a report, written in letter form and dated June 26, 2012, by Dr. Mattucci, noting his recollection of his May 9, 2008 examination of Soto. (Doc. 63-5 at 2.) In a motion to strike filed by Soto, Soto objected to this letter, arguing that it should be stricken because it was not in the form of a sworn affidavit or an unsworn declaration. (Doc. 90 at 2.) In an order dated March 13, 2013, the court denied Soto's motion to strike with respect to Dr. Mattucci's letter, but stated that it would rely upon Dr. Mattucci's documentation in Soto's medical records rather than the letter. (Doc. 98 at 2-3.)

9

On May 12, 2008, Soto presented to PA O'Brien for follow-up on his orthopedic surgery consultations. (Doc. 63 ¶ 77.) PA O'Brien reviewed Soto's right biceps injury history to date, his ongoing restrictions, and instructed Soto to return to the medical department as needed. (*Id.* ¶ 78.) PA O'Brien also ordered continuation of physical restrictions and of anti-inflammatory/pain relief medication for six (6) months. (*Id.* ¶ 79.) Dr. Bohinski signed off on PA O'Brien's assessment, plan, and orders on May 13, 2008. (*Id.* ¶ 80; Doc. 63-2 at 24.)

At Soto's May 4, 2012 deposition taken in connection with this action, Soto indicated that his right arm only hurts when it rains or when he overworks it, at which time he needs ibuprofen to ease the pain. (Doc. 63 ¶ 83; Doc. 63-1 at 15, Soto Dep.) He also stated that his right arm is improving with time. (Doc. 63 ¶ 84; Doc. 63-1 at 18.) He lifts weights with machines in the prison yard, but the medical department prohibits him from lifting free weights in the gymnasium. (Doc. 63-1 at 18.)

In his complaint, in addition to his claims of deliberate indifference to his medical needs, Soto also avers that a policy or custom exists within the DOC to avoid performing necessary surgical procedures because of monetary implications. (Doc. 1-1; Doc. 58 ¶ 26.) DOC Defendants submit the following material facts relevant to this allegation. The DOC's medical services are provided by a contracted vendor, in this case Corizon, who is solely responsible for implementing an appropriate course of

treatment, including surgery where necessitated by the severity of injury. (Doc. 58 ¶ 27.) The DOC policy that controls the process and procedure for ordering and effectuating specialty consultations for inmates who have sustained an injury is Section 1 of DOC Policy 13.2.1, "Access to Health Care Procedures Manual." (*Id*. ¶ 32; Doc. 59-4, Ex. D.) Under this policy, with respect to specialty consultations, the contracted vendor is "required to complete the diagnostic process and begin initial treatment within 60 days. However, when there is any clinical suspicion of a potentially serious or life threatening illness, regardless of the number of diagnostic tests that may be required, the process must be immediate." (Doc. 58 ¶ 32; Doc. 59-4 at 3, Section A(6)(n)(1).) Further, with respect to off-site specialty consultations, the policy provides, in pertinent part, that "[a]n inmate must be seen by the specialty care provider within 60 days of the approval for off-site services with the exception of stat orders for which the vendor will provide specialty care immediately." (Doc. 58 ¶ 33; Doc. 59-4 at 4, Section A(6)(n)(2)(b)(ii).) In this case, Soto's May 8 and 9, 2008 off-site consultations occurred within the 60-day period after his March 18, 2008 injury, as required by DOC policy. (Doc. 58 ¶¶ 33, 34.)

DOC Defendants also submit the following facts with respect to this DOC policy and related to individual Defendants. None of the DOC Defendants possess the authority to provide budgetary input for required medical services. (*Id*. ¶ 28.) As

Registered Nurses, Defendants Waligun and Harris play no role in the ultimate determination of what injuries are treated with surgical intervention, nor do they possess the authority to deny surgical intervention for budgetary reasons. (*Id.*)

As Registered Nurse Supervisor, Defendant Leskowsky plays no role in the ultimate determination of what injuries are treated with surgical intervention, nor does he possess the authority to deny surgical intervention for budgetary reasons. (*Id.* ¶ 29.)

As former DOC Health Care Administrator, Defendant Ginocchetti was responsible for reviewing budgetary requests for infirmary staffing and supply needs, but played no role in the negotiations for contracted health care services and had no authority to deny surgical intervention for budgetary reasons. (*Id.* ¶ 30.)

As Director of the Bureau of Health Care Services, Defendant Ellers is involved in the negotiations for contracted health care services with prospective vendors, but plays no role in the review or submission of annual budgetary requirements for the infirmary at SCI-Dallas, nor does he have authority to deny surgical intervention for budgetary reasons. (*Id.* ¶ 31.)

### B.    **Procedural History**

Soto filed his complaint on November 16, 2010. (Doc. 1-1.) After waiving service of the complaint, (*see* Doc. 9), DOC Defendants filed a motion to dismiss the

complaint on February 3, 2011, (Doc. 10). Medical Defendants also waived service of the complaint, (*see* Docs. 13 & 14), and they filed a motion to dismiss the complaint on March 8, 2011, (Doc. 19). After the motions were ripe, the court issued a memorandum and order granting in part and denying in part the motions to dismiss and directed all remaining Defendants to answer the complaint. (Doc. 33.) Specifically, the court granted DOC Defendants' motion to dismiss with respect to Soto's claims against Defendants Klopotoski and Walsh, and dismissed them as parties. (*Id*.) The court denied both motions to dismiss as to Soto's claims of deliberate indifference against all remaining Defendants. (*Id*.) The court also denied the motions to dismiss with respect to Soto's claim that a policy or custom exists to avoid the high cost of treating prisoners' medical concerns by delaying surgeries and treatment by outside specialists for so long that such treatments would not be possible. (*Id*.)

Both sets of Defendants answered the complaint on October 20, 2011, (Doc. 34), and October 25, 2011, (Doc. 35), respectively. Thereafter, the court issued a case management order setting forth deadlines for discovery and dispositive motions. (Doc. 36.) After the court granted motions for extensions of those deadlines, filed by both parties, (*see* Docs. 36, 41, 46, 51), both sets of Defendants filed the instant motions for summary judgment, (Docs. 56 & 60.) After these motions were filed,

Soto filed a motion to compel discovery. (Doc. 66.) Responsive and reply briefings to the motions for summary judgment have been filed, (Docs. 82, 83, 86, 96), and the instant motions for summary judgment are ripe for disposition.

## II.   <u>Standard of Review</u>

Federal Rule of Civil Procedure 56 sets forth the standard and procedures for the grant of summary judgment. Rule 56(a) provides, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). A factual dispute is "material" if it might affect the outcome of the suit under the applicable substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A factual dispute is "genuine" only if there is a sufficient evidentiary basis that would allow a reasonable fact-finder to return a verdict for the non-moving party. *Id*. When evaluating a motion for summary judgment, a court "must view the facts in the light most favorable to the non-moving party," and draw all reasonable inferences in favor of the same. *Hugh v. Butler Cnty. Family YMCA*, 418 F.3d 265, 267 (3d Cir. 2005).

The moving party bears the initial burden of demonstrating the absence of a disputed issue of material fact. *See Celotex*, 477 U.S. at 324. "Once the moving party

points to evidence demonstrating no issue of material fact exists, the non-moving party has the duty to set forth specific facts showing that a genuine issue of material fact exists and that a reasonable factfinder could rule in its favor." *Azur v. Chase Bank, USA, Nat'l Ass'n*, 601 F.3d 212, 216 (3d Cir. 2010). The non-moving party may not simply sit back and rest on the allegations in its complaint; instead, it must "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324 (internal quotations omitted); *see also Saldana v. Kmart Corp.*, 260 F.3d 228, 232 (3d Cir. 2001) (citations omitted). Summary judgment should be granted where a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322-23. "'Such affirmative evidence – regardless of whether it is direct or circumstantial – must amount to more than a scintilla, but may amount to less (in the evaluation of the court) than a preponderance.'" *Saldana*, 260 F.3d at 232 (quoting *Williams v. Borough of W. Chester*, 891 F.2d 458, 460-61 (3d Cir. 1989)).

## III. <u>Discussion</u>

A plaintiff, in order to state a viable § 1983 claim, must plead two essential elements: 1) that the conduct complained of was committed by a person acting under color of state law, and 2) that said conduct deprived the plaintiff of a right, privilege, or immunity secured by the Constitution and laws of the United States. *West v. Atkins*, 487 U.S. 42, 48 (1988). A defendant's conduct must have a close causal connection to plaintiff's injury in order for § 1983 liability to attach. *Martinez v. California*, 444 U.S. 277, 285 (1980).[8] A prerequisite for a viable civil rights claim is that a defendant directed, or knew of and acquiesced in, the deprivation of a plaintiff's constitutional rights. *Rode v. Dellarciprete*, 845 F.2d 1195, 1207-08 (3d Cir. 1988). On its face, § 1983 creates no exceptions to the liability it imposes, nor does it speak of immunity for any individual who might deprive another of civil rights. *See Buckley v. Fitzsimmons*, 509 U.S. 259, 268 (1993). Nevertheless, it is well-settled that certain government officials possess immunity from § 1983 liability. *Id.*

In the instant case, both sets of Defendants argue summary judgment should be granted in their favor because Soto has failed to state an Eighth Amendment claim for deliberate indifference to his serious medical needs. In addition, both sets of Defendants argue that summary judgment should be granted in favor of all Defendants

---

[8] The Court in *Martinez* explained: "Although a § 1983 claim has been described as 'a species of tort liability,' *Imbler v. Pachtman*, 424 U.S. 409, 417, 96 S. Ct. 984, 988, 47 L. Ed. 2d 128 [(1976)], it is perfectly clear that not every injury in which a state official has played some part is actionable under that statute." *Martinez*, 444 U.S. at 285.

16

because Soto has failed to identify a policy which he claims bars the surgical treatment of inmate injuries for budgetary reasons.[9] Finally, DOC Defendants argue that the claims against the Bureau of Health Care Services ("BHCS") should be dismissed because it is not a "person" under Section 1983.[10] The court will address the first two arguments in turn.

## A.    <u>Deliberate Indifference to Serious Medical Needs</u>

In his complaint, Soto alleges that after he initially received treatment in the infirmary for his right biceps injury, his subsequent treatment with a physical therapist and consultations with orthopedic surgeons were unnecessarily delayed, leading to the inoperability of his injury and loss of functionality in his arm. (Doc. 1-1 at ¶¶ 7-15.) Specifically with respect to the alleged delay, Soto asserts that "all of the defendants had discussions among themselves about [his] condition but agreed to stay silent and acquiesce in not recommending immediate surgery to repair [his] muscle." (Doc. 1-1 ¶ 24.) In their motions for summary judgment, Defendants contend that Soto has

---

[9] Medical Defendants incorporated this argument in the section of their brief in support of summary judgment pertaining to the Eighth Amendment claim. (Doc. 61 at 14.)

[10] Soto names BHCS as a defendant. BHCS is an arm of the Pennsylvania DOC, a state agency. The Eleventh Amendment bars claims for damages against the DOC. *Weigher v. Prison Health Services*, 402 F. App'x 668, 670-71 (3d Cir. 2010). Therefore, because the DOC has not waived its sovereign immunity, any claims for money damages against BHCS will be dismissed. Had Soto overcome summary judgment, any claims for prospective relief against BHCS would have remained viable.

failed to state a claim of deliberate indifference relating to any delay in treatment. Upon consideration, the court agrees with Defendants.

In order to establish an Eighth Amendment claim against a defendant for inadequate medical care, a plaintiff must show "(i) a serious medical need, and (ii) acts or omissions . . . that indicate deliberate indifference to that need." *Natale v. Camden Cnty. Corr. Facility*, 318 F.3d 575, 582 (3d Cir. 2003); *see also Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999). A serious medical need is one that has been diagnosed by a physician as requiring treatment, or one that is so obvious that a layperson would recognize the need for a doctor's attention. *Monmouth Cnty. Corr. Inst. Inmates v. Lanzaro*, 834 F.2d 326, 347 (3d Cir. 1987). In addition, "if 'unnecessary and wanton infliction of pain' results as a consequence of denial or delay in the provision of adequate medical care, the medical need is of the serious nature contemplated by the eighth amendment." *Id.* (quoting *Estelle v. Gamble*, 429 U.S. 97, 103 (1976)). Therefore, deliberate indifference may be manifested by an intentional refusal to provide medical care, delayed medical treatment for non-medical reasons, a denial of prescribed medical treatment, or a denial of reasonable requests for treatment that results in suffering or risk of injury. *Durmer v. O'Carroll*, 991 F.2d 64, 68 (3d Cir. 1993); *see also Spruill v. Gillis*, 372 F.3d 218, 235 (3d Cir. 2004) (quoting *White v. Napolean*, 897 F.2d 103, 109 (3d Cir. 1990) (finding "deliberate indifference to

18

serious medical needs" standard is met when pain is intentionally inflicted on a prisoner, where the denial of reasonable requests for medical treatment exposes an inmate to undue suffering or the threat of tangible residual injury, or when, despite a clear need for medical care, there is an intentional refusal to provide that care)).

The test for whether a prison official was deliberately indifferent is whether that defendant "acted or failed to act despite his knowledge of a substantial risk of serious harm." *Farmer v. Brennan*, 511 U.S. 825, 841 (1994). "The official must both be aware of the facts from which the inference can be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id*. at 837. Thus, a complaint that a physician "has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment . . . ." *Estelle*, 429 U.S. at 106.

Further, when an inmate is provided with medical care and the dispute is over the adequacy of that care, an Eighth Amendment claim does not exist. *Nottingham v. Peoria*, 709 F. Supp. 542, 547 (M.D. Pa. 1988). Mere disagreement as to the proper medical treatment does not support an Eighth Amendment claim. *Lanzaro*, 834 F.2d at 346. Accordingly, "[a] medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment." *Estelle*, 429 U.S. at 107. Only flagrantly egregious acts or omissions can violate the standard. Medical negligence

alone cannot result in an Eighth Amendment violation, nor can any disagreements over the professional judgment of a health care provider. *White*, 897 F.2d at 108-10; *see also Estelle*, 429 U.S. at 105-06 (medical malpractice is insufficient basis upon which to establish an Eighth Amendment violation); *Rouse*, 182 F.3d at 197 ("It is well-settled that claims of negligence and medical malpractice, without some more culpable state of mind, do not constitute 'deliberate indifference.'"); *Lanzaro*, 834 F.2d at 346 (concluding that mere allegations of malpractice do not raise issues of constitutional import). Even if a doctor's judgment concerning the proper course of a prisoner's treatment ultimately is shown to be mistaken, at most what would be proved is medical malpractice and not an Eighth Amendment violation. *Estelle*, 429 U.S. at 105-06; *White*, 897 F.3d at 110.

Turning to the instant case, Soto has received continuous care since injuring his right biceps on March 18, 2008, all of which has been documented by various Defendants. Initially, he was given a physical examination on the day of the incident, prescribed pain relieving medications for his discomfort, and given various restrictions on work and other physical activities. He was also instructed to follow up at subsequent sick calls, which he attended and received further treatment, including continuation of pain relief medication and physical restrictions. Further, two days after the incident, an x-ray was performed, revealing no fracture or deformities. By

March 25, 2008, one week after his injury, Soto was recommended for a physical therapy consultation. Within two weeks of that date, Soto had a physical therapy consultation, at which time the therapist indicated Soto would benefit from self-performance of exercise and opined that Soto may be a surgical candidate if he met appropriate criteria. Thereafter, Soto had several follow-up sick calls with medical staff, who continued his pain relief medication and physical restrictions. In addition, by April 10, 2008, PA O'Brien had ordered a consultation with an orthopedic surgeon. Soto was provided with the first available dates for consultations with two orthopedic surgeons, on May 8 and 9, 2008, respectively. There is nothing in the record indicating that the delay between PA O'Brien's April 10, 2008 order and the May 8, 2008 consultation was intentional on the part of any Defendant. Moreover, there is nothing in the record indicating that Defendants' conservative course of treatment prescribed from the time of the incident through the May 2008 consultations was done in order to intentionally inflict pain upon Soto or expose him to undue suffering or threat of tangible residual injury. In fact, at the time Soto had his two orthopedic consultations, both surgeons declared that surgery was not medically necessary, and rather would be for cosmetic purposes only. Importantly, Dr. Raklewicz stated that no surgical repair of the injury was medically necessary, regardless of when Soto presented to him in temporal relation to the occurrence of the injury. In addition, Dr.

Mattucci's note from his May 9, 2008 consultation clearly states, "no surgery needed (cosmetic only)." (Doc. 63-2 at 22.) Therefore, Soto's assertion that these orthopedic surgeons told him it was "too late" to get surgery by the time he was evaluated on May 8 and 9, 2008, (*see* Doc. 1-1 ¶ 16), is clearly contradicted by the record. In sum, this is not a case where surgery was recommended by a qualified medical professional,[11] and Defendants refused to schedule such surgery, or where Defendants refused to treat Soto after a surgery was scheduled.

Having reviewed the record in this case, it is clear that Soto's contention is not that he was denied medical treatment, but rather that he is dissatisfied with the course and scope of the treatment he did receive. Particularly, Soto is unhappy that prison doctors decided that a conservative treatment involving pain relief medication and physical restrictions followed by light physical therapy would be more appropriate than immediate surgery. Soto, while unhappy with his course of treatment, was, nonetheless, treated for his injury. Unfortunately, despite the medical intervention, Soto continued to suffer from discomfort after his right biceps injury. Consequently, Soto was dissatisfied with the course of treatment and subsequent results. However, an inmate's disagreement with medical treatment is insufficient to establish deliberate indifference. *Durmer*, 991 F.2d at 69; *Spruill*, 372 F.3d at 235. Courts will not

_____

[11] A physical therapist is a non-medical doctor who is not qualified to recommend or perform surgery. (Doc. 61 at 2 n.2.)

second guess whether a particular course of treatment is adequate or proper. *Parham v. Johnson*, 126 F.3d 454, 458 n.7 (3d Cir. 1997). Here, the court finds no evidence in the record to suggest that any Defendant withheld or delayed treatment or was otherwise deliberately indifferent to Soto's medical needs. Accordingly, the motions for summary judgment will be granted in favor of Defendants as to this claim.

### B.    Policy or Custom

In his complaint, Soto alleges that Defendants instituted a policy or custom to avoid the high cost of treating inmates' medical concerns by delaying consultations with outside physicians and specialists for so long that surgical interventions would eventually become either impossible or unadvisable. In their motion for summary judgment, Defendants argue that because Soto has failed to identify a policy that he claims bars the surgical treatment of inmate injuries for budgetary reasons, summary judgment should be granted in their favor.

Initially, the court agrees with Defendants that Soto has not identified a DOC policy that provides for avoidance of surgical intervention for budgetary reasons. In further support of their motions, Defendants have provided the court with DOC Policy 13.2.1, "Access to Health Care Procedures Manual," which controls the process and procedure for ordering and effectuating specialty consultations for inmates who have sustained an injury. (Doc. 59-4, Ex. D.) The policy also covers on- and off-site

23

specialty consultations for both urgent and non-urgent injuries. (*See id*.) Specifically, with respect to off-site specialty consultations, the policy provides, in pertinent part, that "[a]n inmate must be seen by the specialty care provider within 60 days of the approval for off-site services with the exception of stat orders for which the vendor will provide specialty care immediately." (Doc. 58 ¶ 33; Doc. 59-4 at 4, Section A(6)(n)(2)(b)(ii).) In Soto's case, he was seen by two outside orthopedic surgeons on May 8 and 9, 2008. As these consultations occurred within the 60-day period after his March 18, 2008 injury, the court concludes that the applicable Defendants acted appropriately pursuant to this policy, and therefore Soto has failed to state a claim in this regard.

In his brief in opposition to the instant motions for summary judgment, Soto concedes that he has been unable to articulate or identify a specific policy. (Doc. 82 at 10.) Instead, he seemingly argues that a practice or custom of delaying treatment for budgetary reasons can be inferred based on the cases of inmates similarly-situated to himself. (*Id*. at 10-11.) In support, he relies on the declarations of two inmates who sustained injuries that eventually required orthopedic surgery. (Doc. 82-1 at 27-28, Attach. H, M. Brown Decl.; Doc. 82-1 at 30-32, Attach. I, D. Mack Decl.) In the case of declarant Marvin Brown, he sustained a "serious leg injury," but did not have surgery until three weeks later, apparently due to a lost x-ray. (Doc. 82-1 at 27-28.)

In the case of declarant Derrick Mack, after sustaining a knee (patella tendon) injury, he was allegedly mis-diagnosed at an outside (non-prison) hospital, and therefore his surgery did not occur until ten (10) days after the date of the injury. (Doc. 82-1 at 30-32.) The factual scenarios presented in both declarations cannot lead this court to conclude that a custom of delaying surgical intervention for budgetary reasons exists. Importantly, both declarants did, in fact, have surgery to repair their injuries. Any perceptible delay did not lead to the inability to perform these surgeries, according to the declarants. As such, the court fails to see how Soto could support his argument here with the facts from these cases. Stated otherwise, these declarations, which involve scenarios factually dissimilar to the case at bar, do not create a genuine issue of fact as to whether such a custom exists.[12] Therefore, the motions for summary judgment will be granted in favor of Defendants as to this claim.

## IV.  Conclusion

---

[12]  Without leave to file, Soto also submitted a supplemental brief after Defendants filed their reply brief, containing another declaration of an inmate who sustained a shoulder injury and, after receiving treatment, was allegedly told by a prison medical staff member that an operation would take 12 to 18 months to schedule. (Doc. 86 at 8.) This improperly-filed supplement does not dissuade the court from its conclusions herein.

For the reasons set forth herein, summary judgment will be granted in favor of all Defendants in this case.  Due to this ruling, Soto's subsequent motion to compel discovery will be deemed moot.

An appropriate order will issue.


                       s/Sylvia H. Rambo
                      United States District Judge

Dated:  April 3, 2013.

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **ANGEL SOTO,** | : | **CIVIL NO. 1:CV-10-02366** |
| | : | |
| **Plaintiff** | : | **(Judge Rambo)** |
| | : | |
| **v.** | : | |
| | : | |
| **THOMAS LESKOWSKY,** *et al.*, | : | |
| | : | |
| **Defendants** | : | |

## O R D E R

In accordance with the accompanying memorandum, **IT IS HEREBY**

**ORDERED THAT:**

1) Defendants' motions for summary judgment (Docs. 56 & 60) are

**GRANTED** in favor of Defendants.

2) The Clerk of Court is directed to **ENTER** judgment in favor of Defendants.

3) The motion to compel discovery (Doc. 66) is **DEEMED MOOT**.

4) The Clerk of Court is directed to **CLOSE** this case.

                                        s/Sylvia H. Rambo
                                        United States District Judge

Dated:  April 3, 2013.